**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **SHERRY HAMBY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 04-CV-631-TCK-FHM** |
| | ) | |
| **OKLAHOMA DEPARTMENT OF MENTAL** | ) | |
| **HEALTH, ASSOCIATES CENTERS** | ) | |
| **OF THERAPY, a/k/a TULSA** | ) | |
| **SYSTEMS OF CARE, LARRY MARKS, IN** | ) | |
| **HIS OFFICIAL AND INDIVIDUAL** | ) | |
| **CAPACITIES, AND CARL HAWS, IN** | ) | |
| **HIS OFFICIAL AND INDIVIDUAL** | ) | |
| **CAPACITIES, BRIAN BLANKENSHIP** | ) | |
| **IN HIS OFFICIAL AND INDIVIDUAL** | ) | |
| **CAPACITIES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Before the Court is Defendants' Motion for Summary Judgment (Dkt. No. 53) and Plaintiff's

Motion for Partial Summary Judgment (Dkt. No. 97).    Plaintiff sues Defendants[1] alleging claims

of sexual and racial discrimination creating a hostile work environment, and retaliatory termination,

all in violation of Title VII.  Plaintiff also alleges Defendant Carl Haws ("Haws"), in his individual

capacity and agency capacity, and Defendants Larry Marks ("Marks") and Brian Blankenship

("Blankenship"), in their agency capacities, violated 42 U.S.C. § 1985.[2]  Plaintiff further alleges

Defendants violated the Fair Labor Standards Act ("FLSA") by failing to pay her overtime and by

---

[1]Defendant Oklahoma Department of Mental Health was voluntarily dismissed by Plaintiff.

[2]Plaintiff confessed that she failed to state a claim under 42 U.S.C. § 1981, and that claim is therefore dismissed with prejudice.

terminating her in retaliation for reporting such wage violations. Finally, Plaintiff alleges claims of intentional infliction of emotional distress  and wrongful termination in violation of state policy. Defendants move for summary judgment on all claims.  Plaintiff moves for summary judgment only on her claim that Defendants failed to pay her overtime pursuant to the FLSA.

I.       **Factual Summary**

The Systems of Care ("SOC") Best Practice Model is a defined federal and state policy for addressing the needs of mentally ill children and their families.  Tulsa Systems of Care ("TSOC") is a program that began as a pilot project in January 2001 offering services for children and families with mental health problems.  Defendant Associated Centers for Therapy ("ACT") is the host agency for TSOC.  To administer TSOC, ACT receives funding from, and was under contract with, the Oklahoma Department of Mental Health and Substance Abuse Services ("ODMH").  Pursuant to the contract with ODMH, ACT is required to administer the TSOC program using the SOC Best Practice Model with the guidance and assistance of the state project director, state staff, and the state SOC Steering Committee.

ACT assisted TSOC in developing as a community project and maintaining a "wraparound" model.  "Wraparound" is a philosophy of care that uses a "family team" to surround mentally ill children and determine a course of treatment that results in a unique set of community services and natural supports to achieve a positive set of outcomes for the children.  The wraparound model coordinates mental health and other support services to meet the needs of those involved in the TSOC program and thus involves the cooperation of everyone who has a role in serving mentally ill children including family members, educators, mental health workers, social services, the juvenile justice system, and community and recreational agencies.

2

ACT employs several persons in various positions in administering TSOC, including project administrators, care coordinators, and family advocates.  The position at issue in this suit is that of family advocate.  To qualify for the position, an applicant must have raised or lived with a child with mental health issues.  The family advocate provides targeted support services, participates in a system of care that is child-centered with the needs of the child and family dictating the types and mix of services provided, and assists in preventing removal of the child from the home.  This family advocate is empowered to participate in the service-delivery, management, and policy making of TSOC.

The SOC Best Practice Model requires a local steering committee or community team with significant parent representation and involvement to serve as the primary coordinating and oversight body for the program.   In 1999, Plaintiff, as a parent of a child with serious emotional disturbance, was asked by the project director, Haws, to volunteer and assist in the development of TSOC.[3] Plaintiff agreed and was a member of both the state and local steering committees for SOC. Additionally, beginning in January 2001, Plaintiff and another parent volunteered as the first family advocates for TSOC.  Then, in July of 2001,  Plaintiff was offered and accepted a part-time, paid family advocate position.  In 2003, Plaintiff began working as a full-time family advocate.  At all pertinent times, Haws was Plaintiff's supervisor.

Plaintiff received evaluations on January 23, 2002 and July 11, 2003 from Haws.  On both occasions, Plaintiff received good evaluation marks of 8.15 on a scale of 1-10.

However, in the objectives section of the January 23, 2002 evaluation, Haws noted Plaintiff needed to improve her communications skills by omitting foul language and colorful examples.

---

[3]Defendant Haws knew Plaintiff through his previous role as her son's case manager.

Haws also noted Plaintiff needed to "back off" and "let others do their work."  (Def.'s Mot. for Summ. J. Ex. 5.) In the objectives section of the July 11, 2003 evaluation, Haws noted Plaintiff needed to avoid inter-office conflicts "by understanding that everyone is different."  Plaintiff denies that the comments in the objectives sections of her reviews were made by Haws.  She states rather that these were areas Plaintiff herself identified for improvement.

Plaintiff also received four reprimands while employed with ACT.  On October 17, 2002, Plaintiff received a documented verbal review from Haws for being disrespectful to him and other staff members during a meeting.  Plaintiff alleges this reprimand occurred after she questioned whether Haws requested family "flex funds" to buy computers for employees. This possibility upset Plaintiff, as flex funds were primarily for the use of client families and she felt the money should be used for the needs of the client-families.[4]

On September 19, 2003, Plaintiff received two more documented verbal reviews.  These reviews allege Plaintiff neglected her duties when she asked her daughter to call thirty minutes prior to a September 11, 2003 client wraparound session and inform that Plaintiff could not attend. The issue appears to have been that Plaintiff's daughter spoke with someone other than Haws when she informed ACT that Plaintiff would not attend the meeting.

On October 6, 2003, Plaintiff was disciplined for failing to give support to a client-family and for being rude to the family. On October 8, 2003, she received another write-up for disregarding the management system by complaining about her supervisor and co-workers.

Plaintiff alleges a number of other incidents that she claims support her Complaint.  These

---

[4]The ODMH investigated this allegation and found no wrong doing on the part of Haws. (Defs.' Mot. for Summ. J. Ex. K p. 24 l.6 - 31. l.4.)

incidents, taken together with the undisputed facts alleged by Defendants, follow.

In February of 2002, Plaintiff alleges Haws verbally accosted her after a TSOC Steering Committee meeting where the issue of changing two volunteer advocates to paid status arose. Plaintiff alleges Haws opposed the change in status. The Committee voted to hire the advocates and pay them retroactive to their start date. After the meeting, Plaintiff alleges Haws told her never to challenge him in public again. Plaintiff alleges Haws became routinely verbally abusive and retaliatory toward her from that time forward.

Plaintiff alleges that during a staffing meeting on August 8, 2003, Haws announced that TSOC had incurred an inexplicable $64,000 budget deficit. To reconcile the deficit, Haws suggested either diverting funds from the families' flex funds or returning the parent advocates to volunteer status. Plaintiff requested the materials from Haws that reflected the deficit, and Haws provided them to her. In reviewing the documents, she discovered that $50,000 of new money had not yet been included in the balance sheets but could not reconcile a remaining $12,000 deficit in the salaries category of the budget. When Plaintiff relayed this information to Haws, Plaintiff alleges Haws angrily told her she was wasting her time. In his deposition, Haws denied announcing a budget deficit and any suggestion of diversion of funds to reconcile same. Plaintiff presents evidence of two other witnesses who also claim Haws announced the deficit and the possible diversion of funds at the meeting on August 8, 2003. Following this incident, Plaintiff inquired about the need for an audit of TSOC expenditures. Plaintiff directed her inquiries to Blankenship, Clinical Director of TSOC, Terry Cline, Commissioner for the ODMH, Rand Baker, Deputy Commissioner ODMH, Janice Hendrix ("Hendrix"), State Steering Committee Chair, and Stephanie

Crawl, TSOC Steering Committee Chair.[5]

On August 11, 2003, Plaintiff emailed Hendrix, chairperson for the state SOC Steering Committee, regarding the most recent meeting of the Committee during which Plaintiff felt Haws and others had made derogatory comments about her.  On August, 14, 2003, Plaintiff alleges Haws verbally assaulted her regarding the email to Hendrix and that a co-worker had to prevent Haws from further advancing on Plaintiff.

On August 20, 2003, Plaintiff filed a complaint with the TSOC Steering Committee against Haws regarding the incident on August 14, 2003, the incident on August 8, 2003, the amount of her annual raise, and Haws' refusal to provide Plaintiff with a letter of recommendation.[6]  (*See* Pl.'s Resp. to Def. Mot. for Summ. J. Ex. 15.)  On that same day, Plaintiff also filed a complaint with the Oklahoma Human Rights Commission ("OHRC") alleging hostile work environment and retaliation arising from the incident on August 14, 2003.[7]

On August 22, 2003, Plaintiff's co-worker Ruth Archer ("Archer"), filed a grievance against Plaintiff.  In this grievance, Archer conveyed concerns about the hostile environment Plaintiff was creating and concerns about Plaintiff's job performance.  Archer specifically complained that Plaintiff would "lash out" and send emails about TSOC and Haws any time she got upset.  Archer felt such angry communications were not in the best interest of TSOC and its clients.  Archer later withdrew her grievance.

During a meeting on September 2, 2003, Plaintiff was advised by Haws that prior to sending

---

[5]There is no evidence that this investigation revealed any wrongdoing on the part of Haws.

[6]The record should reflect Haws provided Plaintiff with a letter of recommendation. It simply did not include what Plaintiff wanted.

[7]The Complaint was later transferred to the Equal Employment Opportunity Commission ("EEOC").

out emails about TSOC, she would need to get prior approval from Haws. Plaintiff was also directed not to complain to others about her supervisor but rather advised to "vent" to authorized persons. At one point, Haws specifically informed Plaintiff that he would need to approve any emails she planned to "send to the [W]hite [H]ouse and "legislators."[8] (Pl.'s Resp. To Defs.' Mot. For Summ. J. Ex. 17.)

On September 5, 2003, Michelle Motisi, a TSOC client, requested that Plaintiff be removed from her wraparound team due to personality differences. Ms. Motisi alleged that Plaintiff had treated her hatefully in a recent telephone conversation between the two.

On September 11, 2003, Plaintiff appeared at the regularly scheduled staff meeting. At the meeting, Plaintiff was confronted by her coworkers regarding rumors that she was sending out derogatory emails about TSOC. Plaintiff's coworkers expressed concern that such emails were threatening the reputation and efficacy of TSOC and creating a hostile work environment. Following the meeting, Plaintiff suffered extreme anxiety, dizziness, nausea, and vomiting. This incident preceded the reprimands Plaintiff received on September 19, 2003.

Soon thereafter, Plaintiff filed a complaint with the Occupational Safety and Hazard Administration ("OSHA"), advising that she felt threatened by her coworkers during the September 11, 2003 meeting.

On September 24, 2003, Plaintiff alleges an emergency TSOC staff meeting was called to discuss Plaintiff's OHRC and OSHA complaints. Plaintiff attended the meeting and alleges she

---

[8]The ACT policy governing approval of communications to the public prior to release specifically excludes communications to the Governor and Legislature from any formal clearance requirements. Defendants deny ACT policies and procedures govern the TSOC project and Plaintiff offers nothing to refute their denial.

again felt threatened by her coworkers whom she alleges were led to believe that their salaries would be cut due to the complaints filed by Plaintiff.

On September 29, 2003, ACT received a handwritten note from client Susan Bloxsom ("Bloxsom"). In the note, Bloxsom requested a new family advocate due to Plaintiff's rudeness and unavailability.

In November 2003, Plaintiff alleges Haws allowed a coworker, Archer, to draft and present an agreement for Plaintiff's signature that would preclude Plaintiff from tape recording meetings and would impose criminal penalties if violated. Ultimately, the agreement was not presented to Plaintiff or any other member of TSOC. Though Archer testified Haws "concurred" with the draft language in the agreement, Haws denies that he authorized Archer to present the agreement. Blankenship testified that he told Plaintiff she did not need to sign the agreement. Plaintiff alleges that presentation of the agreement was intended to intimidate or harass her.

On November 26, 2003 a meeting was held between Plaintiff and Haws. The purpose of the meeting was to discuss alleged statements of Plaintiff while attending a meeting in Washington, D.C. The issue of discussing TSOC matters and her conflicts with Haws with outside agencies was again discussed. Plaintiff denies discussing the internal business of TSOC while in D.C. and states that she only spoke generally with Susan Stromberg, the federal SOC Project Officer for the United States Department of Health and Human Services, as well as members of the Congress and Senate about Oklahoma SOC. She states that Blankenship told her specifically that speaking about policy issues in general was not prohibited. Plaintiff alleges that the Deputy Commissioner for ODMH conveyed to Blankenship that state officials were not happy about Plaintiff's comments to federal policy makers.

On January 26, 2004, ACT received an email from TSOC Steering Committee member Regina Rogers-Boyce ("Rogers-Boyce") wherein Rogers-Boyce complained of Plaintiff making repeated complaints to others about Haws and TSOC. Roger-Boyce felt such communications could "not be good for team morale or anything else." (Defs.' Mot. for Summ. J. Ex. 15.)

On February 23, 2004, yet another meeting was held regarding improper communications by Plaintiff. The subject arose after Plaintiff communicated with persons outside of TSOC regarding events at a TSOC Steering Committee meeting. After the February 23, 2004 meeting a memo was distributed to all staff reiterating the expectation that all communications, including verbal communications, regarding TSOC business were to be filtered through Haws. (*See id.* at Ex. 18.) Plaintiff disputes this memo was ever distributed and that it was fabricated to support her termination. In fact, Plaintiff contends that after the February 23, 2004 meeting, on March 10, 2004, Haws told Plaintiff that the rule regarding communications only applied to written communications. Defendants present evidence of two other employees who testify that they were aware of the TSOC policy on outside communications.

On April 12, 2004, Blankenship received information that Plaintiff had contacted an employee at the ODMH regarding whether the child of an employee of TSOC could be eligible for the TSOC program.[9] The ODMH employee informed Blankenship that Plaintiff had given her specific information about the employee's child. Defendants allege Plaintiff did not get prior approval for this communication and that she conveyed private information about a potential client. Plaintiff denies that she failed to get prior approval for the communication stating that Haws'

---

[9]There is nothing in the record to indicate it was not permissible for TSOC to offer services to an employee's child.

authorized Marcia Keesee ("Keesee") to act in his absence.  Keesee, however, specifically testified that she did not give Plaintiff permission to call the ODMH regarding the TSOC employee/child issue.  (*Id*. at Ex. 6 p. 93 ll. 1-12.)  Plaintiff further states that she asked only about the general policy regarding availability of the program for the children of TSOC employees. The deposition of the ODMH employee whom Plaintiff called indicates that Plaintiff discussed much more than general policy matters.  (S*ee* Defs.' Rep. to Plaintiff's Resp. to Defs.' Mot. for Summ. J. Ex. 11.) Further, on the day of Plaintiffs' call to the ODMH employee, the employee sent an email to her supervisors at ODMH regarding her conversation with Plaintiff earlier in the day.  The pertinent portion of the email reads:

Just to give you a heads up.

> Sherry Hamby called me on the way to work this morning.  She was very angry that Ruth Archer's son was being reviewed by the Care Team.  She said that it wasn't right.  She said the rules were changed and no one told her.  She said that she had to tell Grace that she could not be a Family Advocate until her child graduated.  She said that TSOC has 5 or 6 cases still waiting and won't be reviewed until next month.  She said that it was unfair that a Family Advocate gets preferential treatment.  She said the rule changed had not been discussed before by the Community Team.

(Def.'s Mot. for Summ. J. Ex. 26.)

On April 15, 2004 Plaintiff was terminated for "failure to meet job expectations."  (Defs.' Mot. for Summ. J. Ex. 24.)   The termination letter states, "[y]our failure to clear all external communications with your supervisor, Carl Haws, prior to the transmission is the offense on which this action is being taken."  *Id.*  Plaintiff appealed her termination.  In denying her appeal, Defendants specifically outlined Plaintiff's repeated failures to clear external communications with Haws and noted that based on the numerous complaints, incidents, and reprimands surrounding the issue, Plaintiff was fully aware of the policy when she telephoned the ODMH in April of 2004. *Id.*

10

at Ex. 17.

As evidence for her sexually and racially hostile work environment claims, Plaintiff offers the following.  Plaintiff stated that while in Washington, D.C., Haws told her she was acting like a prostitute and could be arrested.  Plaintiff alleges her daughter was present when this statement was made.  Plaintiff also alleges Haws made statements about Plaintiff's daughter performing oral sex. Plaintiff also cited a comment made by Haws at a meeting wherein a tape-recorder was being used. Specifically, during a discussion about the use of a tape-recorder for "protection," Haws remarked, "does everyone need a condom for protection?"  (Defs.' Mot. for Summ. J. Ex. 28 p. 137.)  Plaintiff also offers evidence of remark made by Haws regarding a TSOC child masturbating. Finally, Plaintiff alleges that she was informed that Archer referred to her as a Chinese whore.

Plaintiff's allegations of racially hostile remarks follow.[10]  Plaintiff alleges Haws suggested to her that she wear feathers in her hair to ensure workplace diversity, that Haws mocked a "skunk tail" necklace worn by Plaintiff, and referred to Plaintiff as white trash.  Finally, Plaintiff alleges another coworker commented that Native Americans are murderers and drunks.

## II.     Applicable Standards

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The Court must view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence which would require submission of the case to a jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986); *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998).

---

[10] Plaintiff is an enrolled member of the federally recognized Eastern Shawnee Tribe.

### III. Discussion

*A.      Hostile Work Environment Claims*

Title VII prohibits discrimination in employment based on race, color, sex, religion and national origin. 42 U.S.C. §2000e–2 *et seq*.  To successfully establish a sexually hostile work environment claim, Plaintiff must prove the conduct toward her was (1) unwelcome, (2) based upon her sex, and (3) sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment. *Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1022 (10th Cir. 2001).  Likewise, a successful racially hostile work environment claim will show that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and (2) the harassment was racial or stemmed from racial animus."  *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998).

In *Harris v. Forklift Systems Inc.,* the Supreme Court concluded that, for purposes of the third element, the conduct in question must be judged by both an objective and a subjective standard. The conduct must be "severe or pervasive enough to create . . . an environment that a reasonable person would find hostile or abusive," and the victim must "subjectively perceive th[at] environment to be abusive." 510 U.S. 17, 21 (1993); *see Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1243 (10th Cir. 2001), *cert. denied*, 122 S.Ct. 1435 (2002).   Further, in determining whether a work environment is hostile or abusive, all of the circumstances of the case must be examined, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work performance; and (5) what psychological harm, if any, resulted. *See Harris*, 510 U.S. at 23.  However, Plaintiff need not demonstrate psychological harm, nor is she

12

required to show that her work suffered as a result of the harassment. *Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998). Instead, the existence of sexual and racial harassment must be determined in light of the totality of the circumstances, such as the nature of the abuse and the context in which the alleged incidents occurred. *Meritor Sav. Bank*, 477 U.S. at 69. The Court is not persuaded that Plaintiff has demonstrated the third element necessary for either of her hostile work environment claims.  Specifically,  the harassment complained of was not severe or pervasive enough to constitute racial or sexual harassment in the legal sense.

Plaintiff lists four incidents of alleged sexually hostile behavior during her tenure with Defendants.  These include remarks by Haws referring to Plaintiff as a prostitute and remarks about Plaintiff's daughter's sexual activities, a reference at a meeting to condom use, and speculation about a  child masturbating.  These four remarks are insufficient to amount to a pervasively hostile environment.

As to Plaintiff's claim of hostile environment stemming from racial discrimination, Plaintiff must  likewise  demonstrate  "that  the  workplace  is  permeated  with  discriminatory intimidation, ridicule, and insult [ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *O'Shea v. Yellow Technology Services, Inc*, 185 F.3d at 1093, 1097 (10th Cir. 1999) (quotations omitted).  Paralleling the requirements for a claim of sexually hostile environment, this standard requires a showing of more than "a few isolated incidents of racial enmity." *Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1214 (10th Cir.1998).  Again here, Plaintiff's allegations of racial remarks, even if taken as true, fall well short of the cases in which a reasonable jury could differ about whether a person was suffering from a racially hostile workplace.

13

In sum, a review of the evidence in this matter indicates that any hostility in the workplace was generated by the tenuous relationship between Haws and Plaintiff and Plaintiff's refusal to comply with directives from him.   There simply is not the requisite discriminatory animus motivating severe or pervasive actions by Defendants necessary to create the hostile work environment Title VII prohibits.  Defendants' Motion for Summary Judgment on Plaintiff's claims of hostile work environment is GRANTED.

B.      Title VII Retaliation

To succeed on her claim for Title VII retaliation, Plaintiff must show that she engaged in protected opposition to a statutorily protected activity, and as a consequence, was subjected to adverse employment action by Defendants.  *See Lowe v. Angelo's Foods, Inc.*, 87 F.3d 1170, 1176 (10th Cir. 1993).[11]  Thus, in order to establish a prima facie case, Plaintiff must establish a causal link between her participation in a protected activity and the adverse employment action.  *Murray v. City of Sapulpa*, 45 F.3d 1417, 1420 (10th Cir. 1995).   Once Plaintiff makes a prima facie showing, Defendants must articulate a legitimate nondiscriminatory reason for the adverse employment action.  Plaintiff must then respond by demonstrating Defendants' asserted reasons for the adverse action are pretextual.  *Id.*

Plaintiff states that after her complaint to the OHRC on August 20, 2003, and her OSHA complaint made in September of 2003, she began receiving an increased number of reprimands. Plaintiff claims she only received one reprimand prior to this time.[12]  This temporal proximity is

---

[11]Title VII retaliation claims may be maintained even where a plaintiff cannot prove her substantive Title VII claims.

[12]As a point of fact, the Court would note that in addition to the reprimand of October 17, 2002, there was concern either on behalf of Haws or Plaintiff, about Plaintiff's communication skills

Plaintiff's evidence of the second element of her prima facie case of retaliation and it is enough to shift the burden to Defendants to demonstrate a legitimate nondiscriminatory reason for the adverse employment action. The "causal connection may be established by showing 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Dick v. Phone Directories Co., Inc.*, 397 F.3d 1256, 1259 (10th Cir. 2005) (citation omitted).

Though the reprimands in and of themselves may constitute adverse employment action, Plaintiff was not terminated for cumulative reprimands.[13] Instead, as Defendants state, the nondiscriminatory reason for Plaintiff's termination was her disclosure of a potential client's confidential information after being repeatedly instructed to clear all external communications regarding TSOC business through Haws. *Cf. Jeffries v. State of Kansas*, 147 F.3d 1220, 1232 (10th Cir. 1998) (holding a reprimand, *inter alia*, constituted adverse employment action even though the actions did not actually have an adverse impact on the terms and conditions of the employee's employment). Even were the Court to consider the reprimands as adverse employment or retaliatory action, the Plaintiff fails to establish a genuine issue as to whether that hostility resulted from her complaints. Each reprimand is directly tied to an improper action by Plaintiff. Plaintiff offers nothing to rebut this evidence.

As to her termination, Plaintiff denies that she did anything other than ask the ODHM about

_____

and propensity to be involved in inter-office conflicts as reflected in the objectives sections of her reviews.

[13]As explained in the letter to Plaintiff denying her appeal, it was not necessary for Plaintiff to accrue a certain number of reprimands for the same offense. The right to terminate an employee immediately without prior progressive discipline was reserved by ACT. (Defs.' Mot. for Summ. J. Ex. 17.)

the general policy regarding the eligibility of a TSOC employee's child for TSOC services.  The email sent by the ODMH employee contacted by Plaintiff on the same day refutes Plaintiff's characterization of her inquiry, as does the ODMH employee's deposition. (Defs.' Mot. for Summ. J. Ex. 26.)    However, even assuming Plaintiff's asserted facts are true, Plaintiff nevertheless violated Defendants' policy that communications regarding TSOC business be cleared with Haws pre-dissemination.  Plaintiff offers nothing to rebut that the reasons put forth by Defendants that adverse actions taken against her were pretextual for a discriminatory motive and the evidence reveals none.  Defendants' Motion for Summary Judgment on Plaintiff's claim for Title VII retaliation is GRANTED.

### I.        Co-Worker Retaliation

In order to succeed on her coworker retaliation claim, Plaintiff must show ACT supervisors or management either (1) orchestrated harassment or (2) knew about the harassment and acquiesced in it in such a manner as to condone and encourage the coworkers' actions.  *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998).

Plaintiff claims that on September 24, 2003 a meeting was called to specifically address how the staff would handle Plaintiff's complaints to OSHA and the OHRC.  The OSHA complaint stemmed from a regularly scheduled staff meeting at which time staff members discussed with Plaintiff the ongoing internal conflict between she and Haws and her dissemination of information to persons outside of TSOC.  Plaintiff claims that thereafter, Haws called another meeting to address her OSHA and OHRC complaints.  Defendants offer evidence that this meeting was a regularly scheduled team building meeting regularly attended by ACT and TSOC employees in order to relax and build relationships.  (*See* Defs.' Reply to Pl.'s Rsp. to Defs.' Mot. for Summ. J. Ex. 3 p. 89; Ex.

16

5 pp. 95-96; Ex. 6 pp 84-86.)  The meeting was held at a local Pizza Hut.  Plaintiff offers nothing

to dispute that characterization of the meeting.  As Exhibit 36 to her Response, Plaintiff filed an

unofficial transcript of a tape recording of the meeting.  It appears throughout the transcript that

Plaintiff's coworkers were not even aware that it was Plaintiff who made the complaints to OSHA

and the OHRC.  In any event, even if Plaintiff felt harassed at the meeting or the previous meeting

on September 11, 2004,[14] she offers no credible evidence either that her supervisors orchestrated the

meeting or that they condoned any such harassment.

Plaintiff tangentially argues that the presentation of the agreement regarding the prohibition

of tape recording of meetings was also coworker harassment condoned by Haws.  However, the

record is unclear as to whether the agreement was ever presented to Plaintiff or whether Plaintiff

simply understood that such agreement had been drafted and voluntarily requested a copy of same.

(*See* Pl.'s Resp. to Defs.' Mot. for Summ. J. Ex. 9 p. 149; Ex. 20 pp. 88-89.)  And, Plaintiff presents

no evidence to clarify same.  Yet, even if the agreement was presented to Plaintiff, the record as a

whole demonstrates that it was not retaliation that motivated the drafting and presentation of the

agreement.  Rather, it was the effort of coworkers to resolve an internal ongoing conflict.  That this

was unpleasant or stressful for Plaintiff, even if known to her supervisors, does not establish her co-

worker retaliation claim.  *See Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1265 (10th Cir.

1998) ("We doubt that the few actions identifiably taken by co-workers, which generally seem to

involve incidents of rudeness, are sufficient to support a claim for retaliation, given that Title VII

neither is a 'general civility code' nor does it make actionable the 'ordinary tribulations of the

---

[14]Plaintiff also submitted an unofficial transcript of this meeting made from her tape recording of the meeting.  (*See* Pl.'s Resp. to Defs.' Mot. for Summ. J. Ex. 18.)

workplace.');  *see also Jeffries v. State of Kan.*, 147 F.3d 1220, 1232-33 (suggesting that "tense personal relationships do not rise to the level of actionable retaliation").  Motion for Summary Judgment on Plaintiff's coworker harassment claim is GRANTED.

C.     *FLSA Overtime Claim*

The Court assumes, without deciding, that the FLSA is applicable to ACT.[15]

Pursuant to 29 U.S.C. § 207(a)(1) an employer is generally required to pay its employees overtime unless the nature of the employee's job exempts that employee from the statute.  *Id.* Section 213 of Chapter 29 of the United States Code and 29 C.F.R. § 541 *et seq.*, delineate certain types of employees who are exempt from these overtime provisions and the tests used in determining exemption status.  *Id.*

ACT claims Plaintiff falls within the exemption defined in 29 C.F.R. § 541.214. That section provides that employees who are compensated on a salary basis rate of at least $250.00 per week are exempt from the overtime requirements provided that: "(1) the employee's primary duty consists of either the performance of office or nonmanual work directly related to management policies or general business operations of the employer . . . where the performance of such primary duty includes work requiring the exercise of discretion and independent judgment." *Id.*

It is undisputed that Plaintiff meets the salary prong of the administrative exemption test. To determine whether Plaintiff may maintain her wage claim then, the Court must determine whether her position allowed her to exercise discretion and independent judgment.

The exercise of discretion and independent judgment implies the employee has authority to

_____

[15]The Court is aware the Dkt. No. 147 supports Defendants' contention that the FLSA is not applicable to ACT.  However, at the time of this writing Plaintiff's response time had not passed and the Court determined it could proceed without determining the applicability of the FLSA.

make an independent choice, free from immediate direction or supervision. *Id*. at § 202 (c). "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and action or making a decision after the various possibilities have been considered." *Id*. at § 202(a). For example, the exercise of discretion and independent judgment does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work. 29 C.F.R. § 541.202(e). The fact that an employee's decisions may be subject to review and that upon occasion the decision are revised or reversed after review does not mean the employee is not exercising discretion or independent judgment. *Id.*

Plaintiff gives the following description of her work. A family advocate must be available, "for the parent twenty-four hours a day, and seven days per week by telephone or in person when the family [is] in crisis due to an episode involving the child or to assist with temporary lack of resources, help the parent learn how to cope with and assert themselves with the courts, social services, professionals, doctors, and the educational system." (Pl.'s Resp. to Defs.' Mot. for Summ. J. p. 10) These duties by their very nature require a family advocate to exercise discretion and independent judgment and are not suited for prior approval by a supervisor or governance by an established policy.[16] Rather, because a family advocate must make "game-time" decisions in counseling her client-families, she must constantly use her own discretion and independent judgment.

Plaintiff notes that ACT asserts Plaintiff was terminated for failing to comply with a specific

_____

[16] Another key factor to consider when determining whether an employee exercises discretion and independent judgment is whether the employee has authority to waive or deviate from established policies without prior approval. 29 C.F.R. § 541.202(b).

policy as a general defense for many of Plaintiff's claims. *See* 29 C.F.R. § 541.202(b) (stating as one of several factors for assessing whether an employee exercises discretion and independent judgment is whether the employee has authority to waive or deviate from established policies without prior approval). However in implementing the policies that required Plaintiff to gain prior approval of her communication with outside persons, Defendants were in no way altering the requirement that family advocates use discretion and independent judgment in their every day duties. While Plaintiff may have taken it upon herself to communicate with others regarding TSOC, that was not part of her job and therefore does not factor into the determination of whether she was entitled to overtime under the FLSA. (*See* Pl.'s Resp. to Def.'s Mot. for Summ. J. p. 9 describing the duties of a family advocate.) The Court finds Plaintiff qualifies for the administrative exemption from the FLSA and therefore her claim for overtime wages fails and Defendant's Motion for Summary Judgment on same is GRANTED.

       *ii.*    *Wage Claim*

Plaintiff claims she was not always paid the statutorily required hourly minimum wage while working for Defendants. Both parties arguments regarding this factor are virtually non-existent. The Court permitted Plaintiff to file a supplement to her wage claim on November 4, 2005. Plaintiff attached the supplement to her motion to file same but never filed the actual supplement. Plaintiff is ordered to file same within ten (10) days of the date of this Order accompanied by a brief of no more than five pages arguing why she is entitled to same. Defendants will then have proper notice and response time.[17] Therefore, the Court reserves ruling on the parties' motions on Plaintiffs' minimum wage claim.

---

[17]Defendants' response shall also be limited to ten (10) pages.   No reply briefs will be permitted.

### iii.      FLSA Retaliation Claim

Plaintiff also makes a claim under § 215(a)(3). Thereunder, it is unlawful for an employer

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee;

*Id.*

On April 6, 2004 Plaintiff filed a claim against ACT for failure to pay her overtime.  Plaintiff alleges Blankenship was aware of the claim as she had requested documents from him to support it. Plaintiff was terminated on April 12, 2004.  In her brief argument on the point, Plaintiff seems to allege the proximity in time between her claim for failure to pay overtime and her termination alone is enough to permit a jury to determine whether ACT terminated Plaintiff because she filed the wage claim.  The record shows, overwhelmingly, that Plaintiff was terminated because she violated legitimate directives of her supervisors and thereby jeopardized TSOC's ability to effectively serve its clientele.  The Court must also note the complaints about Plaintiff registered with TSOC by those involved in the program in a variety of roles.  Viewing the record as a whole, it is simply not plausible that Plaintiff was terminated for filing an FLSA wage claim.  Defendant's Motion for Summary Judgment on same is GRANTED.

### D.      Violation of 42 U.S.C. § 1985

Plaintiff alleges Haws, in his individual and agency capacity, and Larry Marks and Blankenship, in their agency capacities, violated 42 U.S.C. § 1985 by conspiring to deprive Plaintiff of her First Amendment rights.  The pertinent provision of § 1985 provides:

> If two or more persons . . . conspire . . . for the purpose of depriving . . . any person . . . of the equal protection of laws, or of equal privileges and immunities under the laws; . . . [or] cause to be done, any act in furtherance of the object of such conspiracy . . . the party so injured or deprived may have an action for the recovery

21

of damages . . . .

The elements of a claim made under § 1985 are: (1) a conspiracy; (2) to deprive a person of equal protection or equal privileges and immunities; (3) an act in furtherance of the conspiracy; and, (4) an injury or deprivation resulting therefrom. *Griffin v. Breckenridge*, 403 U.S. 88, 102-03 (1971).

Key in the assessment of this case is that a conspiracy under § 1985 must be a private conspiracy that is "aimed at interfering with rights that are protected against private, as well as official, encroachment." *Tilton v. Richardson*, 6 F.3d 683, 686 (10th Cir. 1993) ( citation omitted). Thus, the state must be involved in the conspiracy or the aim of the conspiracy must have been to influence the state. *United. Broth. of Carpenters and Joiners of America v. Scott*, 463 U.S. 825, 831 (1983).  Without giving much detail, Plaintiff alleges that Defendants and the ODMH formed a conspiracy to silence Plaintiff thereby violating her First Amendment right to speak to elected leaders and policy makers regarding TSOC policy issues.  Importantly, the evidence alleged by Plaintiff does not meet the specificity requirements for a § 1985 claim, namely that a conspiracy was formed between Defendants and the State or by Defendants to influence the State.  Although Plaintiff offers evidence that ODMH was contacted by a national officer of SOC and that in turn, ODMH contacted ACT, she offers no evidence of the conspiracy that was formed before or thereafter.  For example, when Plaintiff was reprimanded for failing to approve her communications to the SOC national officer with her supervisor prior to making them, the policy that Plaintiff violated was not new.  Plaintiff also appears to allege that the calls to Blankenship after Plaintiff contacted the ODMH regarding the eligibility of a co-employee's child for TSOC and the action taken thereafter as evidence of § 1985 conspiracy.  A review of the deposition of the ODMH employee contacted by Plaintiff reveals that her follow-up on the matter was simply an effort to

further investigate and resolve it.   Plaintiff's allegations that the ODMH employee's call to Blankenship was somehow a request on the part of the State to Blankenship or anyone else to deliberately deprive Plaintiff of her First Amendment right is unreasonable given Defendants' attempts to repeatedly impose a policy for prior approval of external communications well prior to Plaintiff's April 2004 communication to the ODMH.   The evidence shows that, in fact, the initial call from the ODMH employee to Blankenship was nothing more than an effort to either verify or discredit Plaintiff's statements.   The resulting termination of Plaintiff was the consequence Plaintiff had long escaped.   Plaintiff cannot show the requisite evidence of an established conspiracy between the State and Defendants for purposes of § 1985.

Because Plaintiff cannot establish this element, the Court does not proceed with the analysis. Summary judgment is GRANTED to Defendants on Plaintiff's 42 U.S.C. § 1985 claim.

E.     Public Policy Tort

The parties do not dispute that Oklahoma follows the at-will employment rule and that Plaintiff's employment fell into that category.   In an exception to that rule, Oklahoma has adopted a public policy exception to the at-will termination rule in a narrow class of cases where the discharge is contrary to a clear mandate of public policy as articulated by constitutional, statutory, or decisional law.   *See Burk v. K-Mart Corp.*, 770 P.2d 24, 28 (Okla. 1989).   The initial determination of a public policy exception is a question of law.   *See Pearson v. Hope Lumber & Supply Co., Inc.*, 820 P.2d 443, 444 (Okla. 1991).

Plaintiff alleges Defendants violated the SOC Best Practice Model, a policy that has been adopted both at the federal and state levels.   Plaintiff argues Defendants' attempts to limit Plaintiff's communications with outside agencies regarding the business of TSOC violates the SOC Best

Practice Model tenet that the parents of mentally ill children have their interests and concerns reflected in the delivery and management of services, and the policies governing TSOC services. Plaintiff also alleges Defendants terminated her for reporting alleged violations of the laws by Haws.

*Burk* specifically sets forth the circumstances under which an action for wrongful termination may be maintained:

> Accordingly, we believe the circumstances which present an actionable tort claim under Oklahoma law is where an *employee is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with clear and compelling public policy.*

*Burk,* 770 P.2d at 29 (emphasis added).

Here, Plaintiff was not discharged for refusing to act in violation of an established public policy, or for acting consistent with an established public policy.  She was discharged for failing to clear external communications with her supervisor before disseminating same.  This cannot be said to violate the SOC Best Practice Model for parent involvement in the program. To the contrary, it appears that in trying to limit Plaintiff's outside communications, TSOC was trying to protect the private information of its client-families and to prevent Plaintiff from creating a hostile work environment for the family advocates and other TSOC who in fact were trying to carry out the SOC Best Practice Model.  In short, Plaintiff was not  terminated for attempting to make the concerns of the parents of mentally children known, she was terminated for attempting to do that in an inappropriate manner.  That Plaintiff disagreed with some of the ways in which the SOC Best Practice Model was implemented (including its tenet that the parents play a role in the delivery and management of services and the general policies governing the project), and specifically, Defendants' efforts to ensure the dissemination of accurate  information to maintain both the

reputation of TSOC and the confidentiality of its clients, does not constitute a public policy tort.

The following cases demonstrate that, to establish a *Burk* tort, one must be terminated for refusing to act in violation of a well-defined public policy or for performing an act consistent with clear and compelling public policy. For example, in *Groce v. Foster*, 880 P.2d 902 (Okla. 1994), the court found a public policy tort where an employer discharged an employee who was injured on a well-site location, collected worker's compensation from his employer, but brought a third-party claim against a service contractor at the site. The service contractor was also a customer of the plaintiff's employer. Plaintiff alleged his employer attempted to force him to drop his claim against his client and ultimately fired him because he would not. The court found this to be an exception to the at-will termination rule because the employee's right to bring an action against the contractor, in addition to his worker's compensation claim, is specifically outlined in OKLA. STAT. tit. 85 §§ 12, 85. *See also Hinson v. Cameron*, 742 P.2d 549, 553 n.10 (Okla. 1987) (recognizing that an employee's dismissal for filing a workers' compensation claim based on an Oklahoma's statutory right to file a worker's compensation claim would constitute a public policy exception to the termination at-will rule.)

In *Vannerson v. Board of Regents of University of Oklahoma*, 784 P.2d 1053 (Okla. 1989), the court found a viable claim under *Burk* if an employee could show he was discharged for alleging his supervisor made an illegal disposition of state-owned property. Again the court based its decision on very specific statutory language: "[n]o office or employee of any state agency shall prohibit or take disciplinary action against employees of such agency . . . for reporting any violation of state or federal law, rule or policy; mismanagement; a gross waste of public funds; an abuse authority; or a substantial and specific danger to public health or safety." OKLA. STAT. tit. 74 § 840-

2.5(A)(2).   Similarly, in *Todd v. Frank's Tong Service, Inc.*, 784 P.2d 47 (Okla. 1989), the Oklahoma Supreme Court found a *Burk* tort where an employer dismissed an employee who refused to drive a vehicle that had faulty brakes and headlights.   The court held that such a practice "obviously contravenes this state's deeply rooted interest and public policy commitment to making its highways as safe as possible."   *Id.* at 50.

Finally, *Burk* torts have also been found where an employee refused to commit a crime.   *See White v. American Airlines, Inc.*, 915 F.2d 1414 (10th Cir. 1990); *McGehee v. Florafax International, Inc.*, 776 P.2d 852 (Okla. 1989) (discharge of employee who refused to commit perjury); *Sargent v. Central National Bank & Trust Co. of Enid, Oklahoma*, 809 P.2d 1298 (Okla. 1991) (discharge for refusal to destroy or alter a report to a bank's audit committee, as prohibited by statute).

Plaintiff has shown only that she disagreed with the way in which those who were managing TSOC went about implementing the public policy at issue.   She cannot show that she was terminated for attempting to act consistent with, or in violation of, the SOC Best Practice Model.   Accordingly, Defendants' Motion For Summary Judgment on same is GRANTED.


F.      *Claim for Intentional Infliction of Emotional Distress*

Oklahoma recognizes intentional infliction of emotional distress as an independent tort. *Eddy v. Brown*, 715 P.2d 74, 76 (Okla. 1986).   In Oklahoma, to prove intentional infliction of emotional distress, a plaintiff must meet the narrow standards of RESTATEMENT (SECOND) OF TORTS § 46, which provides in pertinent part:   "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional

distress, and if bodily harm to the other results from it, for such bodily harm."   Comment d to RESTATEMENT (SECOND) OF TORTS § 46 provides:   "[L]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Breeden v. League Servs. Corp.*, 575 P.2d 1374, 1376 (Okla. 1978) (citing RESTATEMENT (SECOND) OF TORTS § 46).   It is the trial court's responsibility to act as gatekeeper—to determine first whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to sustain a claim. *See Breeden*, 575 P.2d at 1377.

Likewise, it is for the court to determine in the first instance whether, based upon the evidence presented, severe emotional distress can be found.   *See id.* "Only when it is found that reasonable people would differ in an assessment of this central issues may the tort of intentional infliction of emotional distress be submitted to the jury." *Miller v. Miller*, 956 P.2d 887, 901 (Okla. 1998).   Plaintiff claims that the alleged harassment caused her high blood pressure, anxiety, and depression.

The case of *Merrick v. Northern Natural Gas Co.*, 911 F.2d 426, 433 (10th Cir. 1990) (applying Oklahoma law) is instructive on the conduct element of Plaintiff's intentional infliction of emotional distress claim.   There, the plaintiff's intentional infliction claim failed as a matter of law even though the plaintiff alleged that, prior to his termination, the defendant harshly criticized him, yelled at him, cursed him on one occasion, and allowed another employee to switch offices with plaintiff.

27

> Insubordination, yelling, hostile reactions and the hurt feelings naturally accompanying such conduct do not give rise to a cause for intentional infliction of emotional distress. We hold that [the supervisor] and [the employee] were involved in an ordinary employer-employee conflict and that the record is devoid of any evidence supporting either . . . of intentional infliction of emotional distress.

*Merrick*, 911 F.2d at 433 (citation omitted). Indeed, Oklahoma courts have found inadequate to support a claim of intentional infliction of emotional distress actions that are more compelling that those alleged by Plaintiff.[18]

The case of *Miller v. Miller*, 956 P.2d 887 (Okla. 1998) demonstrates the kind of extreme conduct required to succeed on a claim of intentional infliction for emotional distress. In *Miller*, a woman convinced her boyfriend that she was pregnant with his child, when in fact it was another man's child. The boyfriend married her and raised the child as his own for several years, only to find out later that he was not the child's natural father and that he had no right to see the child. The *Miller* court held the woman's actions, which irreparably altered the man's life, rose to the level of the tort of outrage and permitted the claim to go to the jury. *Id.* at 901. The facts alleged by Plaintiff

---

[18]*See Eddy*, 715 P.2d 74 (multiple instances of ridicule and harassment of employee); *Breeden*, 575 P.2d 1374 (multiple letters and a phone call to plaintiff/debtor, in which the collection company called plaintiff a "God damned liar" and a "deadbeat"); *Miner v. Mid-America Door Co.*, 68 P.3d 212 (Okla. Ct. App. 2002) (co-employee's verbal abuse regarding employee's sexuality and physical threats); *Mirzaie v. Smith Cogeneration, Inc.,* 962 P.2d 678 (Okla. Ct. App. 1998) (employer calling the plaintiff in the middle of the night and browbeating him for hours, requiring him to do unnecessary work, and making derogatory sexual comments about the plaintiff's fiancee); *Anderson v. Oklahoma Temporary Servs.*, *Inc.*, 925 P.2d 574 (Okla. Ct. App. 1996) (former supervisor's conduct in describing how sexual favors could be used to obtain business, discussing former employee's faults with another employee, making lewd remarks about former employee, leaving door open to restroom and coming out with her skirt up to waist, opening her blouse to show bra to co-workers and commenting on her sex life with her husband within hearing distance of employees); *McMullen v. City of Del City*, 920 P.2d 528 (Okla. Ct. App. 1996) (threatening gestures and remarks made by police officers; police officers celebrating after traffic conviction of plaintiff by saying "Yea we won, we're having a pizza party, and I am buying the pizza," followed by officers eating pizza in front of plaintiff's house).

that Haws verbally assaulted her on numerous occasions, which in turn caused her to suffer high blood pressure, anxiety, and depression, even if true, cannot compare.  Accordingly, Defendants' Motion for Summary Judgment on intentional infliction of emotional distress is GRANTED.

**IV.     Conclusion**

Defendant's Motion for Summary Judgment (Dkt. No. 53) is GRANTED in part and DENIED in part.  Plaintiff's Partial Motion for Summary Judgment (Dkt. No. 97) is DENIED.  The pretrial of this matter set for November 15, 2005, shall be continued until Plaintiffs' minimum wage claim is fully briefed.

**ORDERED this 14th day of November, 2005.**

**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**